# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ROBERT L. REESE, Derivatively on Behalf of Nominal Defendant FIFTH THIRD BANCORP,<br><br>      Plaintiff,<br><br>   v.<br><br>GREG D. CARMICHAEL, TAYFUN TUZUN, FRANK FORREST, NICHOLAS K. AKINS, B. EVAN BAYH III, JORGE L. BENITEZ, KATHERINE B. BLACKBURN, EMERSON L. BRUMBACK, C. BRYAN DANIELS, THOMAS H. HARVEY, GARY R. HEMINGER, JEWELL D. HOOVER, EILEEN A. MALLESCH, MICHAEL B. MCCALLISTER, MARSHA C. WILLIAMS, JERRY W. BURRIS, DARRYL F. ALLEN, ULYSSES L. BRIDGEMAN, JR., JAMES P. HACKETT, KEVIN T. KABAT, and HENDRIK G. MEIJER,<br><br>      Defendants,<br><br>  and<br><br>FIFTH THIRD BANCORP,<br><br>      Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Robert L. Reese ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Fifth Third Bancorp ("Fifth Third" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), unjust enrichment, derivative claim for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and Contribution for Violations of Sections 10(b) and 21D of the Exchange Act. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of: filings by Fifth Third with the U.S. Securities and Exchange Commission ("SEC"); press releases; news reports; analyst reports; investor conference transcripts; publicly available filings in lawsuits; matters of public record; and documents produced in response to a books and records demand pursuant to Ohio Revised Code § 1701.37 (the "Books and Records Demand").

## I.     NATURE AND SUMMARY OF THE ACTION

1.     Fifth Third is a diversified financial services company and is the indirect holding company of Fifth Third Bank, National Association (the "Bank").  It operates under four main business segments: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management.  Fifth Third provides a variety of financial products, including checking, savings, and money market accounts; wealth management solutions; payments and commerce solutions; insurance services; and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans, and auto loans.

2.     Between 2010 and at least 2016, Fifth Third used an incentive compensation program that rewarded employees for cross-selling, *i.e.* increasing the total number of products

and services that are provided to existing bank clients. Though cross-selling is a common business strategy, Fifth Third's incentive compensation program set sales goals "at a level higher than the anticipated sales for thousands of employees."

3.     To meet these lofty sales goals, Fifth Third's employees opened deposit accounts and credit cards, enrolled consumers in online-banking services, and opened lines of credit without consumers' consent. These unauthorized accounts were often funded by transferring funds from the same consumer's authorized account (without the consumer's knowledge or consent) and returning the funds after the unauthorized account qualified under the sales goal tracking or incentive program.

4.     On March 2, 2020, Fifth Third disclosed that the Consumer Financial Protection Bureau ("CFPB") would file an enforcement action against the Company regarding unauthorized account openings. Accordingly, the Company increased its estimate for losses related to legal and regulatory proceedings to $56 million, up from $27 million in the prior period report.

5.     On this news, the Company's stock price fell $3.52, or 14%, over four consecutive trading sessions to close at $22.20 per share on March 6, 2020.

6.     On March 9, 2020, the CFPB filed its action against the Bank in the United States District Court for the Northern District of Illinois, captioned *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case No. 1:20-cv-01683 (the "CFPB Action"). The suit alleges violations of the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices, the Truth in Lending Act, and the Truth in Savings Act, and their implementing regulations.

7. On this news, the Company's share price fell $3.90, or 17.5%, to close at $18.30 per share on March 9, 2020. It continued to decline by $2.40, or 15%, over the next several trading sessions to close at $15.90 per share on March 12, 2020.

8. These revelations precipitated the filing of a securities class action in the United States District Court for the Northern District of Illinois against Fifth Third and certain of its officers, captioned *Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp, et al.*, Case No. 1:20-cv-02176 (the "Securities Class Action"), alleging violations of the Securities Exchange Act of 1934. The Company is also subject to consumer class actions based on substantially the same alleged misconduct: *Hartt v. Fifth Third Bancorp.*, Case No. 1:20-cv-00547 (S.D. Ohio) and *Zanni v. Fifth Third Bancorp, et al.*, Case No. 1:20-cv-03407 (N.D. Ill.) (together, the "Consumer Class Actions").

9. Although Plaintiff made the Books and Records Demand, Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board as demonstrated by the documents produced by Fifth Third. The Board is currently composed of fifteen members, thirteen of whom are named in this action. As alleged herein, eleven of the current directors knew or recklessly disregarded that the Company's incentive compensation plan set unreasonable goals that encouraged unethical business practices such as unauthorized account opening. Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act and contribution for violations of Section 10(b) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action

is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

**Plaintiff**

12.     Plaintiff Robert L. Reese purchased 800 shares of Fifth Third stock in March 2013 and has continuously owned his Fifth Third stock since that date.

**Nominal Defendant**

13.     Nominal Defendant Fifth Third is incorporated under the laws of Ohio with its principal executive offices located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.  The Company stock trades on the NASDAQ exchange under the symbol "FITB."

**Defendants**

14.     Defendant Greg D. Carmichael ("Carmichael") has served as the Chief Executive Officer ("CEO") of the Company since November 2015, as director since 2015, and as President since September 2012.  Prior to that, he served as Chief Operating Officer ("COO") of the Company from June 2006 to September 2012 and Chief Information Officer from June 2003 to June 2006.

15.     Defendant Tayfun Tuzun ("Tuzun") has served as the Chief Financial Officer ("CFO") of the Company since 2013.

16.     Defendant Frank Forrest ("Forrest") has served as Special Advisor to the CEO since January 2020.  Prior to that, he served as the Company's Chief Risk Officer ("CRO") since 2014.

17.     Defendant Nicholas K. Akins ("Akins") has served as a director of the Company since 2013.  He is Chair of the Nominating and Corporate Governance Committee.  He was a member of the Human Capital and Compensation Committee.

18.     Defendant B. Evan Bayh III ("Bayh") has served as a director of the Company since 2011.  He is a member of the Nominating and Corporate Governance Committee.  He was a member of the Risk and Compliance Committee.

19.     Defendant Jorge L. Benitez ("Benitez") has served as a director of the Company since 2015.  He is a member of the Nominating and Corporate Governance Committee.  He was a member of the Audit Committee and the Risk and Compliance Committee.

20.     Defendant Katherine B. Blackburn ("Blackburn") has served as a director of the Company since 2014.  She is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

21.     Defendant Emerson L. Brumback ("Brumback") has served as a director of the Company since 2009.  He is Chair of the Audit Committee and a member of the Finance Committee.

22.     Defendant C. Bryan Daniels ("Daniels") has served as a director of the Company since 2019.  He is a member of the Risk and Compliance Committee and the Audit Committee.

23.     Defendant Thomas H. Harvey ("Harvey") has served as a director of the Company since September 2019.  He is a member of the Risk and Compliance Committee.

24.     Defendant Gary R. Heminger ("Heminger") has served as a director of the Company since 2006.  He is Chair of the Finance Committee and a member of the Human Capital and Compensation Committee, as well as the Risk and Compliance Committee.

25.     Defendant Jewell D. Hoover ("Hoover") has served as a director of the Company since 2009.  She is a member of the Audit Committee and the Risk and Compliance Committee.

26.     Defendant Eileen A. Mallesch ("Mallesch") has served as a director of the Company since 2016.  She is Chair of the Audit Committee.  She is also a member of the Human Capital and Compensation Committee, and Risk and Compliance Committee.

27.     Defendant Michael B. McCallister ("McCallister") has served as a director of the Company since 2011.  He is Chair of the Human Capital and Compensation Committee.  He is also a member of the Finance Committee and the Audit Committee.

28.     Defendant Marsha C. Williams ("Williams") has served as a director of the Company since 2008.  She is a member of Human Capital and Compensation Committee and the Nominating and Corporate Governance Committee.  She served as a member of the Audit Committee from 2008 to April 2014 and from 2016 to April 2017, and the Risk and Compliance Committee from 2008 to April 2017.  As Lead Independent Director, she serves as an ex-officio member of the Audit and Risk and Compliance Committees.

29.     Defendant Jerry W. Burris ("Burris") served as a director of the Company from 2016 to June 2020, when he resigned.  He served as a member of the Audit Committee and the Risk and Compliance Committee.

30.     Defendant Darryl F. Allen ("Allen") served as a director of the Company from 1997 to 2014.  He served as Chair of the Audit Committee.

31.     Defendant Ulysses L. Bridgeman, Jr. ("Bridgeman") served as a director of the Company from 2007 to 2016.  He served as a member of the Risk and Compliance Committee until April 2014.

32. Defendant James P. Hackett ("Hackett") served as a director of the Company from 2001 to April 2016.

33. Defendant Kevin T. Kabat ("Kabat") served as a director of the Company from 2007 to 2015.

34. Defendant Hendrik G. Meijer ("Meijer") served as director of the Company from 2001 to April 2017. He was a member of the Compensation Committee and the Risk and Compliance Committee.

35. The defendants named in ¶¶ 14-34 are sometimes referred to hereinafter as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

36. By reason of their positions as officers, directors, and/or fiduciaries of Fifth Third and because of their ability to control the business and corporate affairs of Fifth Third, at all relevant times, the Individual Defendants owed Fifth Third and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Fifth Third in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Fifth Third and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Fifth Third and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fifth Third, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Fifth Third, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

38. To discharge their duties, the officers and directors of Fifth Third were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Fifth Third were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.    Fiduciary Duties of Directors of Federal Banking Institutions**

39. The Board has a responsibility, as part of its fiduciary duties to Fifth Third and its stockholders, to oversee the operations of the Company and to maintain sufficient systems or controls to be reasonably certain that misconduct at the operational level would be elevated to the Board and executive management for remediation. The Board fails in that responsibility if it (i) fails to implement appropriate reporting systems or controls or (ii) consciously fails to monitor or oversee the systems and controls it put in place.

40.     While the boards of all Ohio corporations have this oversight duty, federal regulatory bodies place special emphasis on the oversight function of boards of banking institutions.  Following the mortgage crisis of the last decade that threw a spotlight on deceptive and unethical banking practices, the federal government enacted regulations and issued guidance on the duties of banks and, in particular, their boards of directors, to oversee ethics and legal compliance in their operations.  Each of these regulatory schemes is meant to ensure that large banks employ systems and controls designed to detect suspicious activity in their sprawling operations.

41.     The Federal Deposit Insurance Corporation ("FDIC") defines the duties of bank directors as follows:

> Th[e] [fiduciary duties of care and loyalty mean] that directors are responsible for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; monitoring and assessing the progress of business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; and for making business decisions on the basis of fully informed and meaningful deliberation.

42.     The Office of the Comptroller of the Currency ("OCC") describes the primary fiduciary duties of bank directors similarly: To discharge their duties as Fifth Third's officers and directors, and as further informed by OCC Bulletin 2014-5242, Defendants "were required to exercise reasonable and prudent supervision over [Fifth Third's] management, policies, practices, and controls of the affairs of the Company."

**C.     Audit Committee Charter**

43.     The Audit Committee is a joint committee of the Boards of the Company and of the Bank.  One of the committee's primary purposes is to monitor the integrity of the entities' financial statements, the internal audit function, and the system of internal controls.

44.     With respect to the committee's internal audit function, the Audit Committee Charter states that its members must, among other things:[1]

- Receive and review reports from the internal audit department regarding:

    1) execution of the internal audit plan quarterly, including audit results with a focus on reports that result in a less than satisfactory audit rating;

    2) achievement of annual audit plan;

    3) outstanding audit findings and/or issues by rating, as well as those which are past-due or have been re-aged, ***systemic issues which are pervasive or persistent across audits and over time, as well as trends in issues (volume, ratings, by line of business, etc.);***

    4) ***significant trends of risk exposures and control matters;***

    5) ***significant governance issues that arise in the course of performing audits;***

    6) any unwarranted restriction on access by internal auditors to all Corporation activities, records, property, and personnel;

    7) objective internal audit department performance metrics quarterly;

    8) departmental budget or financial information and staffing levels (annually for approval and updates quarterly);

    9) major projects;

    10) significant departmental initiatives;

    11) significant staff training activities;

    12) results of internal and external quality assurance reviews;

    13) ***any potential fraud involving management or employees who are significantly involved in the internal controls of the Corporation as necessary;***

    14) its opinion on the adequacy of risk management processes, including the effectiveness of management's self-assessment and remediation of identified issues; and

---

[1] Unless otherwise stated, all emphasis herein is added.

       15) ***materials relative to significant industry, accounting, risk management or internal control matters that impact audit scope or emphasis.***

45.     Moreover, as to Compliance Oversight, the charter provides that the Audit Committee members must:

- Establish procedures and require the Corporation to obtain or provide the necessary resources and mechanisms for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

- Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Corporation's financial statements or accounting policies.

- Discuss with the Corporation's General Counsel and Chief Risk Officer legal matters that may have a material impact on the financial statements and that may have an impact on the Corporation's compliance policies.

- Oversee the administration of the Corporation's Code of Business Conduct and establish an enforcement mechanism for the Corporation's Code of Business Conduct and Ethics, including coordinating, as necessary, with the Nominating and Corporate Governance Committee in connection with oversight, enforcement and consideration/recommendation of waivers thereof.

- Consider any material waivers of the Corporation's Code of Business Conduct and recommend to the Board of Directors of the Corporation whether or not to grant such waiver.

- ***Receive and review reporting regarding calls to the Corporation's Ethics Line.***

**D.    Risk and Compliance Committee Charter**

46.     The Risk and Compliance Committee is a joint committee of the Boards of the Company and of the Bank. The charter states, under "Purpose of the Committee":

***The Committee's sole and exclusive function is responsibility for the risk management framework and policies of the Corporation's and the Bank's global operation and oversight of its global risk management framework.*** In furtherance of this function, the Committee shall:

- Oversee management's compliance with all of the Corporation's and the Bank's regulatory obligations arising under applicable federal and state banking laws, rules and regulations;

- Oversee management's development and implementation of the global Risk Management Framework ("Framework"), inclusive of the risk appetite, with an enterprise view of risk capacity, risk tolerances, risk limits, and key risk indicators that are integral components of the Framework, as well as monitoring compliance with the Framework. In addition, the Framework includes consistent processes for identifying, assessing, managing, monitoring and reporting risks of all types, including the categories of credit risk, price risk, interest rate risk, liquidity risk, operational risk, legal and regulatory compliance risk, reputation risk and strategic risk;

- Oversee the fiduciary activities and fiduciary policies of the Corporation and its bank subsidiaries;

- Ensure that risk processes are supported by a risk governance structure that includes oversight by the Boards of Directors of the Corporation and the Bank, policies, risk limits, and risk committees, and further by a safe and sound culture that supports risk management objectives and reflects appropriate accountability by all lines of defense;

- Oversee the Company's supervisory issues and enforcement actions and the Corporation's efforts to remediate them; and

- Oversee the Retail Nondeposit Investment Product Program.

47. The committee's responsibilities with respect to risk management are categorized as general risk, liquidity risk, interest rate risk and price risk, credit risk, operational risk, reputation risk, strategic risk, legal and regulatory compliance risk, fiduciary duties, and retail nondeposit investment products. As to general risk management, the charter states that committee members must:

- Ensure that the Corporation is taking appropriate measures to apply consistent methodologies for identifying, assessing, managing, monitoring and reporting risk to the Corporation including the categories of credit risk, price risk, interest rate risk, liquidity risk, operational risk, legal and regulatory compliance risk, reputation risk and strategic risk.

- Regularly review reporting that provides a high-level dashboard view of the inherent risk, adequacy of controls and residual risk by risk category and comparison of residual risk to risk tolerance for each risk category; key risk

indicators; key risk limits; top risk issues; forward-looking opportunities and risks; key initiatives; and risk appetite.

- Review and discuss with management reports on other selected risk topics as deemed appropriate by management or the Committee.

- Review information relating to compliance with both external regulations and internal policies regarding all risk categories.

- Review and recommend to the Board of Directors of the Corporation the approval of certain regulatory filings, such as the insured depository institution resolution plan.

- Receive and review reports on not less than a quarterly basis from the Corporation's Chief Risk Officer. The subject of such periodic reports shall include, but not be limited to:

  - Capital planning and management, to include CCAR Reporting;

  - Liquidity management and contingency funding planning;

  - Loan portfolio reporting;

  - Compliance reporting;

  - Operational Risk;

  - Technology Risk;

  - Asset/Liability management and market functions; and

  - Other risks material to the oversight of the Corporation's risk management framework, including, but not limited to, credit risk, market risk, reputational risk, BSA/AML risk, and strategic risk.

The Committee shall also review periodic reports from the Corporation to include Credit Risk Review, Model Risk Management, and Regulatory and Compliance Risk.

48. Regarding operational risk, the committee must, among other things "***Review management reports relating to operational risk issues in areas including but not limited to: fraud* . . . .***"

49. And as to legal and regulatory compliance risk, the charter states that its members must, among other things:

- Review management reports relating to legal and regulatory compliance risk issues in areas including but not limited to: material litigation, legal settlements and defense complaints, new regulations and their impact, information safeguarding, anti-money laundering, and fair lending, as well as information regarding the adequacy of the Corporation's compliance risk management program and significant compliance issues and/or findings.

50. Moreover, the charter provides the Risk and Compliance Committee members have responsibilities with respect to regulatory oversight. In particular, they must:

- Oversee the Corporation's and/or the Bank's efforts to comply with or correct regulatory findings or supervisory issues, including those issues labeled as "Matters Requiring Attention" or "Matters Requiring Immediate Attention," included in examination or inspection reports issued by a regulatory authority ("Supervisory Issues").

- ***Discuss with management, the Audit Committee of the Corporation's Board of Directors and the internal auditors the Bank's compliance with applicable laws and regulations and from time to time advise the Bank's Board of Directors with respect to the same.***

- Work with the Audit Committee of the Corporation's Board of Directors to ensure that any and all audit related deficiencies identified in any audit, Supervisory Issue or Order are properly addressed and that the Audit Committee is informed of management's progress in responding to any audit, Supervisory Issue or Order.

- Oversee the Corporation and/or the Bank's efforts to comply with any Memoranda of Understanding, Written Agreement, Consent Order, Stipulation or other agreement, supervisory letter or similar action of any regulatory authority ("Order").

## E.    Human Capital and Compensation Committee Charter

51. The Human Capital and Compensation Committee is a joint committee of the Boards of the Company and of the Bank. One of the committee's primary purposes is to "oversee the incentive compensation plans, policies and programs encompassing those employees of the Corporation and its subsidiaries who, either individually or as part of a group, have the ability to expose the Corporation to material risk ('Covered Employees')."

52.    Specifically, the Human Capital and Compensation Committee Charter states, in

relevant part:

C. Risk and Compliance Oversight

Consistent with its responsibilities to oversee the Compensation Risk Oversight
Committee:

- Ensure the establishment of an effective incentive compensation strategy which
provides balanced risk-taking incentives in alignment with the Corporation's
risk appetite.

- Discuss, evaluate, document, and review with the Chief Risk Officer at least
annually Executive Officer compensation plans and employee compensation
plans and the risks these plans pose to the Corporation. The risk assessment is
also reviewed by the Risk and Compliance Committee of the Board of
Directors.

- Identify and limit features of:

     a.  Executive Officer compensation plans that could lead the officer to take
     unnecessary and excessive risks;

     b.  Employee compensation plans that pose risks to ensure the Corporation
     is not unnecessarily exposed to risk; and

     c.  Both Executive Officer and employee compensation plans that
     encourage behavior focused on short-term results rather than long-term
     value creation.

- Discuss, evaluate, review, and document at least annually the terms of
employee compensation plans and identify and eliminate features that
encourage manipulation of reported earnings to enhance the compensation of
employees.

- Oversee the inherent risk approach and measurement, including the
methodology used for identifying Covered Employees, and document the
review and any modifications made.

- Oversee management's program of ongoing monitoring and independent
validation to assess the effectiveness of incentive compensation policies, and
document the review and any modifications made.

- Prepare narrative description of how the above features were limited and
include annual certification in the proxy statement of the completed review.

**F.      Nominating and Corporate Governance Committee Charter**

53.      The Nominating and Corporate Governance Committee is a joint committee of the Boards of the Company and of the Bank.  One of the committee's primary purposes is to "develop and recommend to the Board of Directors the Corporate Governance Guidelines and Code of Business Conduct and Ethics."

54.      To this end, the committee's charter states that its members' responsibilities include, among other things:

- Create and review at least annually, the corporate governance policies of the Corporation, including Corporate Governance Guidelines, and Code of Business Conduct and Ethics and the Government Affairs Policy, to ensure that they are appropriate for the Corporation and comply with applicable laws, regulations and listing standards, and to recommend any desirable changes to the Board of Directors.

**V.      SUBSTANTIVE ALLEGATIONS**

**A.      Company Overview**

55.      Fifth Third is a diversified financial services company and is the indirect holding company of the Bank.  It operates under four main business segments: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management.

56.      Fifth Third provides a variety of financial products, including checking, savings, and money market accounts; wealth management solutions; payments and commerce solutions; insurance services; and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans, and auto loans.

**B.    Defendants Encouraged Cross-Selling Using Improper Incentive Awards**

**1.    Defendants Long Viewed Cross-Selling as Central to Fifth Third's Success**

57.    Since at least 2010, defendants consistently emphasized the importance of cross-selling to Fifth Third's business, and for years defendants considered cross-selling to be central to Fifth Third's business and growth prospects.

58.    In Fifth Third's 2009 10-K, filed with the SEC on February 26, 2010 and signed by defendants Brumback, Heminger, Hoover, Williams, Allen, Bridgeman, Hackett, Kabat, and Meijer, along with non-parties Mitchel D. Livingston, John J. Schiff, Jr., and Dudley S. Taft, repeatedly emphasized the Company's employment of cross-selling.  In the section of the 2009 10-K describing Fifth Third's businesses, these defendants justified the Company's division of operations by stating that its four "business segments form synergies by taking advantage of cross-sell opportunities."  The 2009 10-K also informed investors that in an otherwise difficult year for Fifth Third, during 2009 the Branch Banking segment "grew credit card balances by $211 million, or 14%, resulting from an increased focus on relationships with its current customers through the cross-selling of credit cards."  Likewise, the 2009 10-K stated, "[c]redit card loans increased $179 million, or 10%, from December 31, 2008 as a result of the Bancorp's continued success in cross-selling credit cards to its existing retail customer base…. Increases in average credit card loans of 12% are a result of cross-selling to the existing customer base."

59.    In the Company's 2010 10-K, filed with the SEC on February 28, 2011 and signed by defendants Brumback, Heminger, Hoover, Williams, Allen, Bridgeman, Hackett, Kabat, and Meijer, along with non-parties William M. Isaac, Livingston, Schiff, and Taft similarly emphasized the Company's employment of cross-selling, stating that its' "business segments form synergies by taking advantage of cross-sell opportunities."

60.     Fifth Third's Forms 10-K for the fiscal years 2011 through 2016 continued to make substantial similar disclosures touting the benefits of cross-selling to the Company's business model.  Each of the Forms 10-K for fiscal years 2011 through 2016 were signed by half of the current twelve outside directors on the Board: defendants Bayh, Brumback, Heminger, Hoover, McCallister, and Williams.

### 2.     Defendants Used Incentive Compensation to Encourage Cross-Selling

61.     Between 2010 and at least 2016, Fifth Third used an incentive compensation program that rewarded employees for cross-selling, *i.e.* increasing the total number of products and services that are provided to existing bank clients.[2]  Though cross-selling is a common business strategy that allows businesses to achieve organic growth cheaper than obtaining new clients, Fifth Third's incentive compensation program set sales goals "at a level higher than the anticipated sales for thousands of employees."[3]

62.     To meet these lofty sales goals, Fifth Third's employees opened deposit accounts and credit cards, enrolled consumers in online-banking services, and opened lines of credit without consumers' consent.[4]  These unauthorized accounts were often funded by transferring funds from the same consumer's authorized account (without the consumer's knowledge or consent) and returning the funds after the unauthorized account qualified under the sales goal tracking or incentive program.[5]

---

[2] Compl. ¶ 15, CFPB Action, Dkt. No. 1.
[3] *Id.*
[4] *Id.* ¶¶ 18-34.
[5] *Id.* ¶ 20.

63. By 2010, at the latest, the Bank was aware that employees opened products and services without consumers' knowledge, when "management was notified of an increase in the number of calls by employees to the internal whistleblower hotline."[6]

64. The Individual Defendants knew or recklessly disregarded that such practices would subject the Company to regulatory scrutiny and reputational harm. On September 8, 2016, the CFPB entered into a consent order with Wells Fargo & Company ("Wells Fargo") for substantially the same conduct: the illegal practice of secretly opening unauthorized deposit and credit card accounts. Specifically, the CFPB found that Wells Fargo had "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking" and that "Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets." Wells Fargo was required to pay full restitution to all victims and a $100 million fine to the CFPB Civil Penalty Fund.

### 3. The Individual Defendants Knew That Employees Opened Unauthorized Accounts to Meet Sales Goals

#### a) Documents Produced to the CFPB Show that the Board Was on Notice of Improper Account Opening

65. The Company internally investigated cases of gaming, which is the "manipulation or concealment of accounts or activities with intent to deceive either customer or bank for personal gain," including "goal attainment, financial gain, retention of position, etc."[7] The graph below shows that gaming increased at nearly every branch between 2014 and 2015:[8]

---

[6] Id. ¶¶ 16, 32.
[7] Opp'n to Mot. to Transfer Venue ("Opp'n Mot."), Ex. 4 at 3, CFPB Action, Dkt. No. 39-5 (Fifth Third Bank's PowerPoint Presentation entitled Bank Protection Overview, dated Oct. 5, 2016).
[8] Id. at 4.



** In 2014 WSUN, FTNM AND FTNK gaming stats rolled up through different affiliates for reporting purposes

66.     However, the above graph does not represent all instances of gaming because the Bank does not "have a systematic way of detecting gaming."[9]

67.     The Bank's employees have sounded the alarm in communications to management. For example, in an email dated June 8, 2010, a Bank employee (identified by the CFPB as the head of retail banking") stated:[10]

> Performance is high, but my belief around [the] method of achieving success is somewhat suspect. [Redacted] and his leadership team have a reputation of less than desirable sales management practices. Bullying and threats are often used to achieve results. As you probably know, ***there have been consistent problems around unauthorized credit card sales in Chicago.***

---

[9] Opp'n Mot., Ex. 5 (Transcript dated Feb. 22, 2017 of Corporate Designee), CFPB Action, Dkt. No. 39-6.
[10] Opp'n Mot., Ex. 1, CFPB Action, Dkt. No. 39-2.

68.     Similarly, a 2011 letter to management notes that the problems at the Chicago office had been reported to the ethics hotline and to the Company's management, to no avail:[11]

> I have tried to raise concerns through the ethics hotline, however it doesn't appear that anything has come of it. I have notified them on numerous occasions. I have notified my FCM and CSM as well, and they have forwarded my concerns to their management team never to receive a response as well.

69.     The 2011 letter specifically raised the issue of unauthorized opening of accounts:[12]

> I can only speak on behalf of my region, but I would consider many of the sales practices and tactics used to be predatory. Many of these sales practices were brought to us by regional and market management. They are openly discussed on our conference calls. Policies such as "everyone should have 2-3 checking accounts", or people "upgrading" (switching existing MasterCard customers to Visa rewards) credit cards for customer[s] without telling them they are applying for new credit[]. We are becoming a "predatory" institution.

> Every week I come across at least 1 or 2 customer that have been taken advantage of. The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had. Some customers have secure checking accounts only to be used for ID Alert[,] [w]hen they can simply add ID alert to the DDA they already have. Some customers have the Secure Checking account as a secondary and are paying for ID alert on their primary checking account. . . .

> One of the "plays" (sales tactics) in our region is to get everyone to have a second or third account. During our close out conference call[,] people discuss ways to get people to open secondary checking accounts. . . . Uneducated customers of ours are being target[ed] to get sales; this is subsequently causing more unnecessary overdrafts by spreading out a customer's funds and also service fees for many customers. . . .

> \*          \*          \*

> Being able to open and close accounts existing customer accounts or adding 3 ddas [demand deposit accounts] to existing customers is being perceived as production. We aren't gaining new households; we're simply rotating our existing customer base for numbers, in fact we're losing more customers than we're gaining, and costing the banking money.

---

[11] Opp'n Mot., Ex. 2, CFPB Action, Dkt. No. 39-3.

[12] *Id.*

70.     The 2011 letter pointed out that "[t]he motivation for these sales practices is simple[:] if you don't meet your goal[,] you get fired."[13]

**b)     Documents Produced In Response to the Books and Records Demand Show** ██ ██ ████ ████ ██ █
██████████████████████████████
███████

71.     ████████████████████████████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
████████████████

72.     ████████████████████████████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
███

73.     ████████████████████████████████

██████████████████████████████
███████     ████████████████████

---

[13] *Id.*

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████     ██████████████████████████████

████████████████████████████████████████████████

███████████████████

74.  ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████  █████████  ████  █████████  ███████  █████
███████████████████████████████████
███████████████████████████

75.  ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████  ██████████████

████████████████████████████████████████████████

████████  ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

76.  ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████  ███████████████████████████

████████████████████████████████████████████████

77. █████████████████████████████████████████

78. █████████████████████████████████████████

79. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████ ████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

80. ████████████████████████████████████████
███████████████████████████ █████████████████████
████ ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

        c)       **Documents Produced In Response to the Books and Records Demand Show** ███████████████████████
████████████████████████████████

81.   ████████████████████████████████

████████████████████████████████████

███████████████████

████████████████████████
████████████████████████
██████ ██████ ██ ████ ████ ██████ ██ ████
████████████████████████
████████████████████████
████ █ ██████ ██ ████ ██ ████ ██ █████ ██
██████ ██ ████ ██ ████ ██████ ████ ██████ ████
████████████████████████
████████████████████████
████ ██████ ██ ████ ████ ██████ ██ ████ ██████
████████████████████████
██████████████████

82.   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

83.   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████ ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

84. ███████████████████████████████████████████

85. ███████████████████████████████████████████

86. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

87.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

88.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

89. ██████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████ ███████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████

90. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

91. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████ ██████ ██████ ██████ ██████ ██████ ██████ ██████ ██████ ██████

██████████████████████████████████████████████████████████████

████████████████████████████

92.  ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████  ██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████

93.  ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████

94.  ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████

**d)** **Documents Produced In Response to a Books and Records Demand Support the Inference** ███████████

███████████

95. ███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

96. ███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

97. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

98. ██████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ ██████ ████████ ████████ ████ ████████ ██████ ████████ ████

████████████████████████████████████████████ ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████.

99. 

100.

## C.    The Individual Defendants Issue Materially Misleading Statements

101.    On February 25, 2016, defendants Carmichael, Tuzun, Akins, Bayh, Benitez, Blackburn, Bridgeman, Brumback, Heminger, Hoover, Kabat, McCallister, Meijer, Williams, and Hackett signed and caused Fifth Third to file its annual report on Form 10-K with the SEC for the period ended December 31, 2015 (the "2015 10-K"), making representations about the Company's compliance risk.  Specifically, it stated:

> Regulatory Compliance Risk is defined as the risk of legal or regulatory sanctions, financial loss, or damage to reputation as a result of noncompliance with (i) applicable laws, regulations, rules and other regulatory requirements (including but not limited to the risk of consumers experiencing economic loss or other legal harm as a result of noncompliance with consumer protection laws, regulations and

33

requirements); (ii) internal policies and procedures, standards of best practice or codes of conduct; and (iii) principles of integrity and fair dealing applicable to Fifth Third's activities and functions. Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks.

.  .  .  .  To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies.

102.    The 2015 10-K also stated that the Company "focuses on reporting and escalation of compliance issues to senior management and the Board."  In this respect:

The Management Compliance Committee is the key committee that oversees and supports Fifth Third in the management of compliance risk across the enterprise. The Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk. The Management Compliance Committee reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors.

103.    The above statements in the 2015 10-K were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

104.    On March 15, 2016, defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Bridgeman, Brumback, Heminger, Hoover, Kabat, McCallister, Meijer, Williams, and Hackett approved and adopted an amended and restated Code of Business Conduct and Ethics.  The revised code was filed as Exhibit 14 to a Form 8-K filed with the SEC on March 16, 2016.  It stated that

the "objective of this Code, which applies to the entire Bancorp, is to ensure that ethics are integrated into all of our business practices, and to articulate our expectations of employees with regard to meeting ethical standards." In relevant part, it provided that employees "must all deal honestly, ethically, fairly and in good faith with Fifth Third's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others." It specifically stated that employees "may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice."

105. The above statements in ¶ 104 were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

106. On February 24, 2017, defendants Carmichael, Tuzun, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, Meijer, and Williams caused Fifth Third to file its annual report on Form 10-K with the SEC for the period ended December 31, 2016 (the "2016 10-K"). It was signed by all of them, except Bayh and McCallister. The 2016 10-K stated that the Company "focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks" and that it "also

focuses on the reporting and escalation of compliance issues to senior management and the Board of Directors."

107.    The above statements in the 2016 10-K were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

108.    On September 19, 2017, defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, Meijer, and Williams approved and adopted an amended and restated Code of Business Conduct and Ethics. The revised code was filed as Exhibit 14 to a Form 8-K filed with the SEC on September 25, 2017. As to ethical business practices, the revised code stated:

    a.  "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers. ***Unethical business practices, such as incentive gaming, falsifying documents or inflating performance results, are strictly prohibited. You are prohibited from manipulating records, opening accounts without customer authorization, offering customers unnecessary products and falsifying records or applications in order to benefit yourself or other employees of Fifth Third.***"

    b.  "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

    c.  "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do their part to protect Fifth Third and our customers from fraudulent activity. There is zero

tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

d. "Employees must not engage in deceptive or dishonest business practices, *such as misrepresenting products or offering customers inaccurate or insufficient information about products in order to benefit personally*."

109. The above statements in ¶ 108 were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

110. On February 28, 2018, defendants Carmichael, Tuzun, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams caused Fifth Third to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"). It was signed by all of them, except Akins. The 2017 10-K stated that the Company "focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks" and that it "also focuses on the reporting and escalation of compliance issues to senior management and the Board of Directors." It also stated:

> The Operational Risk Committee is the key committee that oversees and supports Fifth Third in the management of operational risk across the enterprise. The Operational Risk Committee reports to the ERMC, which reports to the Risk and Compliance Committee of the Board of Directors.

111. The 2017 10-K stated Fifth Third's "core principles of risk management" that "ensure the Bancorp is operating in a safe and sound manner," including:

- Provide transparency and escalate risks and issues as necessary.

- Ensure Fifth Third's products and services are designed, delivered and maintained to provide value and benefit to its customers and to Fifth Third, and that potential opportunities remain aligned to the core customer base.

- Avoid risks that cannot be understood, managed and monitored.

- Act with integrity in all activities.

- Focus on providing operational excellence by providing reliable, accurate and efficient services to meet customer's needs.

- Maintain a strong financial position to ensure that the Bancorp meets its strategic objectives through all economic cycles and is able to access the capital markets at all times, even under stressed conditions.

- Protect the Bancorp's reputation by thoroughly understanding the consequences of business strategies, products and processes.

- Conduct business in compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures.

112. The above statements in the 2017 10-K were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

113. On September 19, 2018, defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams approved and adopted

an amended and restated Code of Business Conduct and Ethics. The restated code was attached

as Exhibit 14 to a Form 8-K filed with the SEC on September 24, 2018. As to ethical business

practices, the revised code stated:

    a.  "Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to: ***incentive gaming***[;] falsifying documents or inflating performance results[;] manipulating records[;] opening bogus or fake accounts[;] opening accounts or selling products without customer authorization[;] offering customers unnecessary products[;] falsifying records or applications in order to benefit yourself or other Fifth Third employees."

    b.  "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

    c.  "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraud activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

    114.   The above statements in ¶ 113 were materially misleading because they failed to

disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and

product goals; (ii) that, as a result of high sales goals and the incentive compensation plan,

employees were reasonably likely to open accounts for the Bank's existing customers without their

consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company

to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual

Defendants failed to implement effective internal controls to detect unauthorized account opening.

    115.   On March 1, 2019, defendants Carmichael, Tuzun, Akins, Bayh, Benitez,

Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams caused

Fifth Third to file its annual report on Form 10-K with the SEC for the period ended December 31,

2018 (the "2018 10-K"). It was signed by all of them, except Williams. The 2018 10-K stated that the Company "focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks" and that it "also focuses on the reporting and escalation of compliance issues to senior management and the Board of Directors." It also stated:

> The Management Compliance Committee, which is chaired by the Chief Compliance Officer, is the key committee that oversees and supports Fifth Third in the management of compliance risk across the enterprise. The Management Compliance Committee oversees Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns and other leading indicators of compliance risk. The Management Compliance Committee reports to the ERMC, which reports to the Risk and Compliance Joint Committee of the Board of Directors of Fifth Third Bancorp and Fifth Third Bank.

116. The above statements in the 2018 10-K were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

117. On September 16, 2019, defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams approved and adopted an amended and restated Code of Business Conduct and Ethics. The revised code was attached as Exhibit 14 to a Form 8-K filed with the SEC on September 20, 2019. As to ethical business practices, the revised code stated:

40

a. "Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to: ***incentive gaming***[;] falsifying documents or inflating performance results[;] manipulating records[;] opening bogus or fake accounts[;] opening accounts or selling products without customer authorization[;] offering customers unnecessary products[;] falsifying records or applications in order to benefit yourself or other Fifth Third employees."

b. "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

c. "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraud activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

118. The above statements in ¶ 117 were materially misleading because they failed to disclose: (i) that Fifth Third's employees received incentive compensation for meeting sales and product goals; (ii) that, as a result of high sales goals and the incentive compensation plan, employees were reasonably likely to open accounts for the Bank's existing customers without their consent; (iii) that the foregoing was unethical and fraudulent activity that exposed the Company to unreasonable risk for violations of federal laws and regulations; and (iv) that the Individual Defendants failed to implement effective internal controls to detect unauthorized account opening.

**D. The Individual Defendants Issued a Materially Misleading Proxy Statement to Solicit Stockholder Votes**

119. On March 6, 2019, defendants Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held April 16, 2019. In the proxy statement, these twelve defendants solicited stockholder votes in

favor of six management proposals, including: (i) a proposal to elect Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams to new terms as directors; and (ii) a proposal to approve the 2019 Incentive Compensation Plan.

120.    The proxy statement disclosed that the Board had determined that defendant Carmichael is not independent.

121.    Regarding corporate governance and risk oversight, the proxy statement stated:

Risk Management Oversight. The role of the Board of Directors is to provide oversight to ensure an effective enterprise risk management program is in place, including an appropriate enterprise risk management framework and related governance structure. The Board sets our overall risk appetite, including the establishment and monitoring of risk tolerances. The formulation of risk appetite considers our operating capacity, which is represented by its available financial resources, defined as Tier 1 Capital less our largest capital buffer (Common Equity Tier 1 Capital Policy Target less the Basel III Buffered Common Equity Tier 1 Minimum), that sets an absolute limit on risk assumption in our annual financial and strategic plans. Our risk appetite is limited by policy to a maximum of 95 percent of operating capacity. Tolerances are the maximum amount of risk applicable to each of the eight specific risk categories included in the enterprise risk management framework. Through their oversight role, directors ensure that the risk management processes designed and implemented under this framework and governance structure are aligned to the Board's corporate strategy and are functioning as directed. The Board also considers the optimal organizational structure at both the Board and management levels. This may include delegating responsibility through Board committees, management committees, the Chief Executive Officer, and the Chief Risk Officer.

Risk management oversight and governance is provided primarily by the Risk and Compliance Committee of the Board of Directors and through the Enterprise Risk Management Committee.

122.    The proxy statement also described the Risk and Compliance Committee responsibilities:

The Risk and Compliance Committee is primarily responsible for the risk management policies of our global operation and oversight of its global risk management framework. This includes oversight of:

- Management's compliance with all regulatory obligations under federal and state banking laws, rules, and regulations;

- Development and implementation of the Risk Management Framework, inclusive of risk appetite;

- Fiduciary activities and policies of the Company and subsidiaries;

- Risk processes to ensure they are supported by a risk governance structure, including oversight by the Board of Directors and risk committees, policies, risk limits, and by a culture that supports risk management objectives and appropriate accountability by all lines of defense, and;

- The Company's supervisory issues and enforcement actions and remediation efforts.

123. Regarding non-employee director compensation, the proxy statement provided that Williams received $166,667 for her service on the Board during 2018; Heminger and Hoover received $140,000 each; Brumback received $130,000; McCallister received $110,000; Akins and Burris received $105,000 each; and Bayh, Benitez, and Blackburn received $95,000 each. In addition to this excessive compensation, the 2017 Incentive Compensation Plan (the "2017 Plan") authorizes the issuance of shares of the Company's common stock for equity awards to Fifth Third's employees and directors. As of February 6, 2019, 3.2 million shares were available for future grant.

124. Equity pursuant to the 2017 Plan is effectively awarded at the discretion of the Board:

> The Committee has broad discretion and authority to, among other things, select the officers, employees, directors, and consultants to whom awards may be granted, to determine the terms, conditions, form, and amount of the awards, to establish, where deemed applicable, performance goals with respect to awards and to measure and certify the achievement thereof, and to establish guidelines and procedures relating to awards.

> The Committee will have full power to administer and interpret the Plan and to adopt or establish, and to modify or waive, rules, regulations, agreements, guidelines, procedures, and instruments that it deems necessary or advisable for the administration and operation of the Plan.

125.     The proxy statement solicited shareholder approval of an amendment to the 2017 Plan to increase the number of shares of common stock reserved for issuance thereunder to 40 million shares.  If approved, the total number of shares reserved for issuance would be 40 million, which represents approximately 6% of the Company's common stock outstanding as of February 22, 2019.

126.     The proxy statement was materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management wile soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

127.     On April 16, 2019, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2019 proxy statement.  In particular: (i) Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams were reelected to new terms as directors; and (ii) the 2019 Incentive Compensation Plan was approved by stockholders.  The reelection of these twelve directors and approval of the 2019 Incentive Compensation Plan based on the misleading statements contained in the 2019 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of them at the expense of the Company's unaffiliated stockholders.

E.     The Truth Fully Emerges

128.     On March 2, 2020, the Company disclosed that the CFPB would file an enforcement action.  In its Form 10-K for the period ended December 31, 2019 (the "2019 10-K"), Fifth Third stated, amid standard statements that it *may* be subject to regulatory investigations and

proceedings, that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings." The Company also increased its estimate for "losses related to legal and regulatory proceedings, including known contemplated enforcement actions and Fifth Third's intended response to such actions" to $56 million, up from $27 million in the third quarter 2019 report.

129.    On this news, the Company's stock price fell $3.52, or 14%, over four consecutive trading sessions to close at $22.20 per share on March 6, 2020.

130.    On March 9, 2020, the CFPB filed its action against the Bank, alleging violations of the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices, the Truth in Lending Act, and the Truth in Savings Act, and their implementing regulations. The lawsuit followed a four-year investigation, beginning with a Civil Investigative Demand ("CID") sent on November 3, 2016.[14] A press release issued by CFPB stated:

> The Consumer Financial Protection Bureau (Bureau) today filed a lawsuit in federal district court in the Northern District of Illinois against Fifth Third Bank, National Association (Fifth Third). The Bureau alleges that for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts. The Bureau alleges that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations.

> The Bureau specifically alleges that for years and continuing through at least 2016, Fifth Third used a "cross-sell" strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals. The Bureau further alleges that, despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers.

---

[14] Mot. to Transfer Venue at 5, CFPB Action, Dkt. No. 20.

Reasonable sales goals and performance incentives are not inherently harmful. But when such programs are not carefully and properly implemented and monitored, as the Bureau alleges here, they may create incentives for employees to engage in misconduct in order to meet goals or earn additional compensation.

The Bureau seeks an injunction to stop Fifth Third's unlawful conduct, redress for affected consumers, and the imposition of a civil money penalty.

131. On this news, the Company's share price fell $3.90, or 17.5%, to close at $18.30 per share on March 9, 2020. It continued to decline by $2.40, or 15%, over the next several trading sessions to close at $15.90 per share on March 12, 2020.

### F. Defendants Carmichael, Brumback, and Hoover Sold Over $6 Million in Fifth Third Stock While in Possession of Material Non-Public Information

Carmichael

132. Defendant Carmichael is the Company's Chief Executive Officer with a highly sophisticated understanding of the Company's results and their import.

133. As set forth herein, defendant Carmichael possessed material negative information which he knew was being concealed from investors. Defendant Carmichael consciously acted to exploit his knowledge by selling nearly $6 million of Fifth Third Stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 11/10/2016 | 17,689 | $23.45 | $414,807 |
| 11/16/2016 | 36,821 | $25.11 | $924,575 |
| 2/13/2018 | 87,613 | $32.37 | $2,836,032 |
| 10/29/2019 | 55,251 | $29.59 | $1,634,877 |
| **Totals:** | **197,374** | | **$5,810,291** |

134. Defendant Carmichael thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

<u>Brumback</u>

135.   Defendant Brumback is the Chair of the Company's Audit Committee with a highly sophisticated understanding of the Company's results and their import.

136.   As set forth herein, defendant Brumback possessed material negative information which he knew was being concealed from investors.  Defendant Brumback consciously acted to exploit his knowledge by selling approximately $100,000 of Fifth Third Stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 3/5/2018 | 3,000 | $33.44 | $100,320 |

137.   Defendant Brumback thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

<u>Hoover</u>

138.   Defendant Hoover is the Chair of the Company's Risk and Compliance Committee with a highly sophisticated understanding of the Company's results and their import.

139.   As set forth herein, defendant Hoover possessed material negative information which she knew was being concealed from investors.  Defendant Hoover consciously acted to exploit her knowledge by selling approximately $270,000 of Fifth Third Stock to her substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 4/28/2017 | 2,000 | $24.82 | $49,640 |
| 2/12/2018 | 3,700 | $32.40 | $119,880 |
| 6/3/2019 | 3,739 | $26.51 | $99,120 |
| **Totals:** | **9,439** | | **$268,640** |

140.   Defendant Hoover thus used her fiduciary position to enrich herself and failed to discharge her duties by causing the Company to candidly reveal the truth of its business condition.

### G. The Individual Defendants Caused the Company to Expend Significant Funds to Repurchase Its Stock

141. The Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged Fifth Third. In total, the Company spent an aggregate amount of over $5.6 billion to repurchase approximately 218,524,672 shares of its own common stock at artificially inflated prices between January 2016 and February 2020.

142. According to Fifth Third's Form 10-Q for the period ended March 31, 2016, the Company purchased 14,742,203 shares of its common stock for approximately $244.72 million at an average price of $16.60 per share. As the Company's stock was actually only worth $15.90 per share, the price at closing on March 12, 2020, the Company overpaid by $10.32 million for stock repurchases during this period.

143. According to Fifth Third's Form 10-Q for the period ended June 30, 2016, the Company purchased 4,496,881 shares of its common stock for approximately $78.2 million at an average price of $17.41 per share. As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $6.7 million for stock repurchases during this period.

144. According to Fifth Third's Form 10-Q for the period ended September 30, 2016, the Company purchased 11,269,837 shares of its common stock for approximately $209.6 million at an average price of $18.60 per share. As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $30.4 million for stock repurchases during this period.

145. According to Fifth Third's 2016 10-K, during the three month period ended December 31, 2016, the Company purchased 6,554,479 shares of its common stock for approximately $167.9 million at an average price of $25.63 per share. As the Company's stock

was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $63.7 million for stock repurchases during this period.

146.     According to Fifth Third's Form 10-Q for the period ended March 31, 2017, the Company purchased 1,630,221 shares of its common stock for approximately $42.8 million at an average price of $26.26 per share.  As the Company's stock was actually only worth $15.90 per share, the price at closing on March 12, 2020, the Company overpaid by $16.8 million for stock repurchases during this period.

147.     According to Fifth Third's Form 10-Q for the period ended June 30, 2017, the Company purchased 12,889,657 shares of its common stock for approximately $321.9 million at an average price of $24.98 per share.  As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $117 million for stock repurchases during this period.

148.     According to Fifth Third's Form 10-Q for the period ended September 30, 2017, the Company purchased 34,061,844 shares of its common stock for approximately $915.5 million at an average price of $26.88 per share.  As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $373.9 million for stock repurchases during this period.

149.     According to Fifth Third's 2017 10-K, during the three-month period ended December 31, 2017, the Company purchased 12,309,373 shares of its common stock for approximately $358.8 million at an average price of $29.15 per share.  As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $163 million for stock repurchases during this period.

150. According to the Company's Form 10-Q for the period ended March 31, 2018, the Company purchased 11,551,101 shares of its common stock for approximately $368.3 million at an average price of $31.89 per share. As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $184.7 million for stock repurchases during this period.

151. According to the Company's Form 10-Q for the period ended June 30, 2018, the Company purchased 8,424,794 shares of its common stock for approximately $261.7 million at an average price of $31.07 per share. As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $127.8 million for stock repurchases during this period.

152. According to the Company's Form 10-Q for the period ended September 30, 2018, the Company purchased 17,071,551 shares of its common stock for approximately $503.6 million at an average price of $29.50 per share. As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $232.1 million for stock repurchases during this period.

153. According to Fifth Third's 2018 10-K, during the three-month period ended December 31, 2018, the Company purchased 15,074,877 shares of its common stock for approximately $404.3 million at an average price of $26.82 per share. As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $164.6 million for stock repurchases during this period.

154. According to Fifth Third's Form 10-Q for the period ended March 31, 2019, the Company purchased 32,850,392 shares of its common stock for approximately $807 million at an average price of $24.57 per share. As the Company's stock was actually only worth $15.90, the

price at closing on March 12, 2020, the Company overpaid by $284 million for stock repurchases during this period.

155.    According to Fifth Third's Form 10-Q for the period ended June 30, 2019, the Company purchased 10,149,506 shares of its common stock for approximately $279.6 million at an average price of $27.55 per share.  As the Company's stock price was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $118.2 million for stock repurchases during this period.

156.    According to Fifth Third's Form 10-Q for the period ended September 30, 2019, the Company purchased 13,680,801 shares of its common stock for approximately $358.1 million at an average price of $26.18 per share.  As the Company's stock price was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $140.6 million for stock repurchases during this period.

157.    According to Fifth Third's 2019 10-K, during the three-month period ended December 31, 2019, the Company purchased 10,614,510 shares of its common stock for approximately $312.8 million at an average price of $29.47 per share.  As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by $144 million for stock repurchases during this period.

158.    According to Fifth Third's Form 10-Q for the period ended March 31, 2020, the Company purchased 333,737 shares of its common stock during January 2020 for approximately $9.7 million at an average price of $29.10 per share, and 818,868 shares during February 2020 for approximately $23.7 million at an average price of $28.98 per share.  As the Company's stock was actually only worth $15.90, the price at closing on March 12, 2020, the Company overpaid by approximately $15.1 million for stock repurchases during this period.

51

159.     In sum, Fifth Third overpaid for stock repurchases by nearly $2.2 billion.

## VI.     DAMAGES TO THE COMPANY

160.     As a direct and proximate result of the Individual Defendants' conduct, Fifth Third has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

(a)     Legal and professional fees incurred in connection with the CFPB Action;

(b)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Fifth Third;

(c)     Funds expended in connection with the stock repurchases;

(d)     Legal fees incurred in connection with the Securities Class Action and/or the Consumer Class Actions;

(e)     Any funds paid for internal investigations of cross-selling consumer practices and whistle blower complaints; and

(f)     Any funds paid to settle the Securities Class Action and/or the Consumer Class Actions.

161.     In addition, Fifth Third's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

162.     The actions complained of herein have irreparably damaged Fifth Third's corporate image and goodwill.  For at least the foreseeable future, Fifth Third will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Fifth Third's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

163.    Plaintiff brings this action derivatively in the right and for the benefit of Fifth Third to redress injuries suffered, and to be suffered, by Fifth Third as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, violations of Section 14(a) of the Exchange Act, unjust enrichment, derivative claim for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and contribution for violations of Section 10(b) of the Exchange Act.  Fifth Third is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164.    Plaintiff will adequately and fairly represent the interests of Fifth Third in enforcing and prosecuting its rights.

165.    Plaintiff has continuously been a shareholder of Fifth Third at times relevant to the wrongdoing complained of and is a current Fifth Third shareholder.

166.    When this action was filed, Fifth Third's Board of Directors consisted of defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams and non-party directors Linda W. Clement-Holmes and Mitchell S. Feiger.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.    Demand is Excused As to Counts I, V, and VI

**Defendant Carmichael**

167.    At all relevant times, Carmichael was the Company's CEO, and therefore was not independent under NASDAQ listing rules. As an employee, Carmichael derives substantially all of his income from his employment with Fifth Third, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis,

and Carmichael personally issued the misleading statements alleged herein. As a result, Carmichael would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants Akins, Benitez, Blackburn, Brumback, Hoover, McCallister, and Williams**

168. Akins, Benitez, Blackburn, Brumback, Hoover, McCallister, and Williams serve or served as members of the Audit Committee. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. Thus, they were responsible for reviewing reports regarding systemic issues, as well as significant trends of risk exposures, including any potential fraud by employees especially as to significant industry matters. They were also responsible for reviewing reporting calls to the Company's EthicsLine. As alleged herein, ████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ ████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████

169. Specifically, ████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████ ██ ███ ██████ ███ █████ ██████ █████ ███ ████████████████████████████████████████████████ ██████████████████████████████████████████████████

███████████████████████████████  ████████████████

███████████████████████████████████████████████

████████████████████████████

**Defendants Akins, McCallister, Heminger, Mallesch, and Williams**

170.     Akins, McCallister, Heminger, Mallesch, and Williams serve or served as members of the Human Capital and Compensation Committee.  As such, they are responsible for the establishing an incentive compensation strategy that does not encourage excessive or unnecessary risk-taking, including overseeing the inherent risk approach regarding Covered Employees.  As alleged herein, not only were these defendants aware of the Wells Fargo scandal, but ████

████████████████████████████████████████████████

████████████████████████.  Thus, they knew or should have known that the Company's incentive compensation plan set unreasonable goals that encouraged unethical business practices such as unauthorized account opening.

**Defendants Bayh, Blackburn, Brumback, Heminger, Hoover, Williams, Carmichael, and McCallister**

171.     Bayh, Blackburn, Brumback, Heminger, Hoover, Williams, Carmichael, and McCallister ███████████████████████████████████████

███████████████████████████████████████████████

█████  Thus, they knew or should have known that the Company's incentive compensation plan set unreasonable goals that encouraged unethical business practices such as unauthorized account opening.

**Defendants Bayh, Benitez, Heminger, Hoover, and Mallesch**

172.     Bayh, Benitez, Heminger, Hoover, and Mallesch serve or served as members of the Risk and Compliance Committee.  As such, they are responsible for reviewing reports regarding

fraud and manage legal and regulatory compliance risk. As alleged herein, not only were these defendants aware of the Wells Fargo scandal, but ██████████████████████████████ ████████████████████████████████████████████████████████████████████████████ Thus, they knew or should have known that the Company's incentive compensation plan set unreasonable goals that encouraged unethical business practices such as unauthorized account opening.

**Defendants Akins, Bayh, Benitez, Blackburn, Heminger and Williams**

173. Akins, Bayh, Benitez, Blackburn, Heminger and Williams served as members of the Nominating and Corporate Governance Committee at all relevant times. As such, they are responsible for annually reviewing Fifth Third's corporate governance policies to ensure that they are appropriate for the Company and comply with applicable laws. As alleged herein, ████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████ Thus, they knew or should have known of the unethical business practices, including unauthorized account opening.

**B.     Demand is Excused as to Count II**

174. At all relevant times, Carmichael was the Company's CEO, and therefore was not independent under NASDAQ listing rules. As alleged herein, Carmichael sold nearly $6 million in Fifth Third stock while in possession of material non-public information regarding the Company's sales practices—$1.2 million worth of the sales were executed days after the Company received the first CID from the CFPB. As a result, Carmichael would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

175. As alleged herein, Brumback was the Chair of the Audit Committee, and Hoover was the Chair of the Risk and Compliance Committee. As such, they would have known of the

Company's unethical sales practices, as well as the CFPB's investigation into the same based on Fifth Third's receipt of the CID. As a result, Brumback and Hoover would be interested in a demand regarding their own wrongdoing, and demand is futile as to them.

176. Additionally, demand is excused as to Akins, Bayh, Benitez, Blackburn, Heminger, Mallesch, McCallister, and Williams. The material negative non-public information known to Carmichael, Brumback, and Hoover is the same information as was to known Akins, Bayh, Benitez, Blackburn, Heminger, Mallesch, McCallister, and Williams when they signed and issued the 2015, 2016, 2017, and 2018 10-Ks. Finding that Carmichael, Brumback, and Hoover traded on such information would be admitting that these defendants knew that Fifth Third's incentive compensation program improperly encouraged employees to engage in gaming, that these defendants breached their fiduciary duties by failing to prevent such unethical practices, and that the foregoing information had been concealed. As a result, demand is excused in connection with the insider selling claim alleged herein.

### C. Demand is Excused as to Count III

177. Akins, Bayh, Benitez, Blackburn, Brumback, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams could not disinterestedly consider a demand in connection with the misleading proxy statement issued in March 2019. These eleven directors issued the proxy statement knowing that representations made it the Company's SEC filings and other disclosures were misleading with respect to sales practices, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in April 2019. Had these eleven directors truthfully and completely revealed the misleading nature of the Company's public statements, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams would not have been reelected as directors, and the 2019 Incentive Compensation Plan would not have been approved. As a result, Akins, Bayh, Benitez,

Blackburn, Brumback, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

### D. Demand is Excused as to Count IV

178. Demand is excused for the reasons set forth in Sections VII.A and B., *supra*.

## <u>COUNT I</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

179. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180. The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fifth Third's business and affairs, particularly with respect to issues as fundamental as public disclosures.

181. The Individual Defendants' conduct set forth herein was due to their deliberate attempt to harm the Company or reckless disregard for its interests, and constituted breach of the fiduciary duties they owed to the Company. The Individual Defendants deliberately attempted to harm the Company or recklessly disregarded for its interests thereby breaching fiduciary duties to protect the rights and interests of Fifth Third.

182. In breach of their fiduciary duties owed to Fifth Third, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

183. In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

184.    As a direct and proximate result of the  breaches of their fiduciary obligations by the Individual Defendants, Fifth Third has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## **COUNT II**

### **Against Carmichael, Brumback, and Hoover for Breach of Fiduciary Duty Through Insider Selling**

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    As alleged above, Carmichael, Brumback, and Hoover are fiduciaries of Fifth Third, possessed material, non-public information of Fifth Third, and used that information improperly to profit from sales of Fifth Third stock.  When Carmichael, Brumback, and Hoover directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

187.    When Carmichael, Brumback, and Hoover sold their Fifth Third stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of Fifth Third stock would be significantly lower.  Carmichael, Brumback, and Hoover timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold.  They thereby benefitted by misappropriating Fifth Third's non-public information.

188.    Plaintiff has no adequate remedy at law.

## COUNT III

**Against Defendants Akins, Bayh, Benitez, Blackburn, Brumback, Carmichael, Heminger, Hoover, Mallesch, McCallister, and Williams for Violations of Section 14 of the Securities Exchange Act of 1934**

189.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on March 6, 2019 violated §14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

191.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

192.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2019 proxy statement solicited shareholder votes for: (i) director nominees; (ii) ratification of the appointment of the Company's independent auditor; (iii) executive compensation; (iv) frequency of future votes on executive compensation; (v) approval of the 2019 Incentive Compensation Plan; and (vi) amendment of the Articles of Incorporation to authorize a class of preferred stock. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

193.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT VI

### Against the Individual Defendants for Unjust Enrichment

194.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

195.   By their wrongful acts and omissions, the Individual Defendants unjustly enriched at the expense of and to the detriment of Fifth Third. The Individual Defendants were unjustly enriched as a result of the executive compensation and director remuneration they received while breaching fiduciary duties owed to Fifth Third. Defendants Carmichael, Brumback, and Hoover were also unjustly enriched as a result of their profits from sales of the Company's stock while in possession of material non-public information.

196.   Plaintiff, as a stockholder and representative of Fifth Third, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by them from their wrongful conduct and fiduciary breaches.

197.   Plaintiff, on behalf of Fifth Third, has no adequate remedy at law.

## COUNT V

### Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris

198.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

199.   This Count is asserted on behalf of the Company against Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch,

McCallister, Williams, and Burris for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

200.    At all relevant times, in connection with Fifth Third's repurchases of its shares, Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris made, disseminated, or approved false or misleading statements about the Company specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris's course of conduct were designed to artificially inflate the price of the Company's common stock.

201.    At the same time that the price of the Company's common stock was inflated due to the false and misleading statements, defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to their false or misleading statements.  Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris engaged in a scheme to defraud the Company by causing it to repurchase its shares at inflated prices.

202.    Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

62

not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of Fifth Third common stock at all relevant times.

203.    Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of Fifth Third common stock, which were intended to, and did deceive the Company regarding its performance and the effectiveness of its internal controls.

204.    Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris were directors and senior management and of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made at all relevant times, as alleged above.

205.    As described above, Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris acted with scienter at all relevant times, in that he acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth herein were either known to Defendants Carmichael, Akins, Bayh, Benitez, Blackburn,

Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris or were so that they should have been aware of them.

206. As a result of Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris's misconduct, Fifth Third has suffered damages in that it paid artificially inflated prices Fifth Third common stock as part of the repurchase program and suffered losses when the true facts became known. The Company would not have purchased Fifth Third common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the false or misleading statements made by Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris.

207. As a direct and proximate result of Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris's wrongful conduct, the Company suffered damages in connection with its repurchases of Fifth Third common stock during the relevant period. By reason of such conduct, Defendants Carmichael, Akins, Bayh, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, and Burris are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

208. Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT VI

### Against Carmichael and Tuzun for Contribution
### for Violations of Sections 10(b) and 21D of the Exchange Act

209. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

210.    Defendants Carmichael and Tuzun are named as defendants in related securities class actions.  The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

211.    Fifth Third is named as a defendant in related securities class actions that allege and assert claims arising under §10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Fifth Third is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

212.    As officers, directors and otherwise, defendants Carmichael and Tuzun had the power or ability to, and did, control or influence, either directly or indirectly, Fifth Third's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5.

213.    Defendants Carmichael and Tuzun are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

214.    Defendants Carmichael and Tuzun have damaged the Company and are liable to the Company for contribution.

215.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Fifth Third, demands judgment as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Fifth Third and that plaintiff is an adequate representative of the Company;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Fifth Third;

D.     Directing Fifth Third to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fifth Third and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     a proposal to strengthen the Company's controls over consumer sales practices and financial reporting;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.     a proposal to strengthen Fifth Third's oversight of its disclosure procedures;

4.     a provision to control insider transactions; and

5.     a provision to permit the stockholders of Fifth Third to nominate at least five candidates for election to the Board;

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Fifth Third has an effective remedy;

F.     Awarding to Fifth Third restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: November 3, 2020

By: _____
Andrew Kimble
**Biller & Kimble, LLC**
8044 Montgomery Road, Suite 515
Cincinnati, Ohio 45236
Telephone: (513) 715-8711
E-mail: akimble@billerkimble.com

**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

**LAW OFFICE OF ALFRED G. YATES, JR. PC**
Alfred G. Yates, Jr.
300 Mt. Lebanon Blvd, Suite 206-B
Pittsburgh, PA 15219
Tel: (412) 391-5164

*Counsel for Plaintiff Robert L. Reese*